**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Animal Hospital of Nashua,</u>
<u>Inc.</u>

    v.

<u>Antech Diagnostics and</u>
<u>Sound-Elkin</u>

Civil No. 11-cv-448-LM
Opinion No. 2014 DNH 106

_____ _

<u>VCA Cenvet, Inc. d/b/a Antech</u>
<u>Diagnostics</u>

    v.

<u>Animal Hospital of Nashua,</u>
<u>Inc.; AHN Pet Hospitals, Inc.;</u>
<u>AHN Animal Hospital Services</u>
<u>Inc.; and Dr. Leo Bishop,</u>
<u>individually and d/b/a The</u>
<u>Animal Hospital of Nashua</u>

## <u>O R D E R</u>

This case arises from a now-defunct business relationship
involving Animal Hospital of Nashua, Inc. ("AHN") and a supplier
of laboratory services and medical equipment, VCA Cenvet, Inc.
("Antech").  The dispute concerns AHN's dissatisfaction with the
quality of certain services and equipment provided to it by
Antech, and Antech's unhappiness over AHN's termination of the
business relationship.  More specifically, the case consists of:
(1) AHN's claims against Antech for breach of contract, breach of
the covenant of good faith and fair dealing, and unjust
enrichment (Counts I, II, and VII of the complaint); (2) AHN's

claims against Sound-Elkin ("Sound") under the same three theories (Counts VIII, IX, and XIII); and (3) Antech's counterclaims against AHN and two related corporate entities for breach of contract (Count I of the counterclaim) and breach of the covenant of good faith and fair dealing (Count II), plus Antech's counterclaim for unjust enrichment against the three corporate entities and AHN's president, Dr. Leo Bishop (Count III).

Now before the court are: (1) a motion for partial summary judgment filed by counterclaim defendants (collectively "AHN") in which they asks the court to rule that the damages to which Antech might be entitled on its counterclaims are limited by several provisions in the service agreements that governed the parties' business relationship; (2) Antech's motion to strike certain summary-judgment exhibits; (3) a motion for partial summary judgment filed by Antech and Sound in which they argue that they are entitled to judgment as a matter of law on AHN's claims that the equipment Antech provided was deficient; and (4) AHN's motion for partial summary judgment that Antech is not entitled to damages in the form of lost profits.  The parties made oral arguments on all four pending motions on April 10, 2014.  The court considers each motion in turn, but begins by addressing the briefing the parties submitted in response to the show-cause order of February 10, 2010, document no. 117.

**Discussion**

A. The Parties' Show-Cause Briefing

In its show-cause order, the court expressed concerns arising from the imprecision of the written documents the parties had identified as memorializing the agreement under which they conducted their business relationship.  Without belaboring the point, the court is now satisfied that there was, indeed, an enforceable contract between AHN and Antech, as described in the two service agreements in the record.

B. Document No. 89

All three counts of Antech's counterclaim are based upon AHN's decision to walk away from its business relationship with Antech approximately three years into the six-year term of the two service agreements.  While the parties agree, as a factual matter, that AHN stopped using Antech's laboratory services and began to use the services of one of Antech's competitors, AHN contends that its actions were a permissible response to Antech's prior breach of the agreement, while Antech disagrees.  In any event, in document no. 89, AHN asks the court to rule that in the event Antech prevails on any of its counterclaims, the damages to which it is entitled are limited in a variety of ways.  Antech objects.  Antech's objection is well taken.

1. Summary-Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Ponte v. Steelcase Inc., 741 F.3d 310, 319 (1st Cir. 2014) (quoting Cortés–Rivera v. Dept. of Corr., 626 F.3d 21, 26 (1st Cir. 2010)); see also Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the court must "view[] the entire record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" Winslow v. Aroostook Cty., 736 F.3d 23, 29 (1st Cir. 2013) (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

"The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corp. de P.R. para la Diffusión Púb., 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

2. Background

The agreement that underlies the parties' business relationship is memorialized in two documents, each captioned "Service Agreement."  Each service agreement required AHN to use Antech as its exclusive provider of laboratory services for six years starting on August 1, 2008, and also required AHN to use and pay for $1.2 million worth of Antech's services over those six years.  The agreements further provided that AHN was to receive "pricing consideration" in the form of billing at a rate of "35% off Antech's list fee schedule."  AHN's Mem. of Law, Ex. A (doc. no. 89-2), at A033946; id., Ex. B (doc. no. 89-3), at A033950.[1]  Hereinafter, the court uses the terms "pricing consideration" and "laboratory-fee discount" interchangeably.

One of the two service agreements (hereinafter "Loan Agreement") includes terms related to a loan made by Antech to AHN as an incentive for AHN to use Antech as its exclusive provider of laboratory services.  The Loan Agreement includes the following relevant provisions:

> 3.3. Default.  If . . . (ii) Animal Hospital Owner breaches the exclusivity provisions set forth in Section 1 hereof . . . then such [breach] shall constitute an event of default with respect to the Loan.  At any time after the occurrence of an event of default, Antech may declare the entire amount of the Loan to be due and payable, whereupon the Loan shall

---

[1] The pagination of the two service agreements is confusing, at best.  For the sake of clarity, the court uses the Bates numbers stamped on the lower right-hand corner of each page of each of those two exhibits.

become forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived . . . .   The remedies available to Antech hereunder are intended to compensate Antech for the Loan and discounts provided hereunder, which Loan and discounts would not have been provided unless Animal Hospital agreed to the Minimum Average Annual Fee requirements set forth herein, the requirements set forth in Section 1 regarding exclusivity, and the payment for Laboratory Services hereunder in a timely manner.

    . . . .

    5. **Termination.**  If (i) a default with respect to the loan occurs as described in Section 3.3 . . . then Antech may terminate this Agreement upon written notice to Animal Hospital Owner.

AHN's Mem. of Law, Ex. A (doc. no. 89-2), at A033942-43 (emphasis in the original).

The other service agreement (hereinafter "Equipment Agreement") incudes terms related to certain x-ray equipment, manufactured by Sound, with a retail value of approximately $139,000, that Antech provided to AHN, also as an incentive.  The Equipment Agreement includes the following provisions:

    **3.1**  . . . .  If (i) the term of this Agreement is terminated in accordance with Section 5 . . . Antech shall cause to be removed from the premises [of AHN] the [Sound] Equipment, and Animal Hospital shall provide reasonable access to its premises in order for Antech to remove such equipment.  **If the Agreement is terminated in accordance with Section 5, Animal Hospital will have the option to purchase the [Sound] Equipment on the following schedule; During Year 1 100% of original price, year 2 80% of original price, year 3 60% of original price, year 4 40% of original purchase price, year 5 20% of original purchase price.**

    . . . .

6

> 5.   **Termination**.  If (i) Animal Hospital breaches
> the exclusivity provision set forth in Section 1 hereof
> . . . , then Antech may terminate this Agreement upon
> written notice to Animal Hospital.

AHN's Mem. of Law, Ex. B (doc. no. 89-3), at A033948-49 (emphasis in the original).

By letter dated August 4, 2011, Dr. Bishop notified Antech that AHN had "entered into a new, multi-year, strategic agreement with IDEXX Laboratories" to provide the laboratory services it had been getting from Antech.  AHN's Mem. of Law, Ex. C (doc. no. 89-4), at 2.  By letter dated September 7, 2011, Dr. Bishop transmitted to Antech: (1) a check in the amount of the most recent invoice AHN had received from Antech; and (2) a second check, for $62,500, to cover the amount of the loan it had not yet repaid.  Dr. Bishop also indicated that AHN did not intend to purchase the Sound equipment it had been provided by Antech, and asked Antech to make arrangements to retrieve it.  Antech has neither cashed AHN's checks nor picked up the equipment.  Moreover, Antech appears never to have terminated the service agreements pursuant to the termination provisions included in each of them.

In their initial disclosures, Antech and Sound responded to a question about computation of Antech's damages in the following way:

> As discovery has not yet begun, any estimate of
> Antech's damages is, necessarily, preliminary and

7

incomplete at this time, and is subject to revision.
However, based on currently available information,
Antech estimates its current damages as approximately
$885,000 (exclusive of interest, costs and, where
applicable, attorneys' fees), consisting of
approximately: (a) $315,000 in lost profits for the
balance of the contract term; (b) $306,000 in
laboratory fee discounts; (c) $139,000 worth of
equipment; (d) loan balance of approximately $85,000;
and (e) accounts receivable of approximately $40,000.

AHN's Mem. of Law, Ex. D (doc. no. 89-5), at 10.

### 3. Discussion

AHN asks the court to rule that Antech may not recover: (1)
lost profits; (2) $306,000 in laboratory-fee discounts; and (3)
$139,000 for the equipment.  It further asks the court to rule
that Antech's remedies are limited to: (1) repayment of the loan
balance; (2) return of the Sound equipment; and (3) payment of
outstanding invoices.  AHN's primary argument is that it is
entitled to all of the relief seeks because the two service
agreements provide that Antech's remedies are limited to
liquidated damages, which would preclude the recovery of lost
profits, laboratory-fee discounts, and money damages for the
value of the Sound equipment.  AHN also makes a separate argument
with regard to the laboratory-fee discounts.  Antech disagrees,
categorically.  The court begins with the liquidated-damages
issue and then turns to the laboratory-fee discounts.

### a. Liquidated Damages

AHN argues that the Loan Agreement and the Equipment
Agreement, taken together, include a provision that limits

Antech's recovery to liquidated damages in the form of repayment of the loan, return of the Sound equipment, and payment of outstanding invoices.  AHN is mistaken.

To rule upon AHN's liquidated-damages argument, the court must construe the two service agreements, both of which provide that they are to be construed under California law.  See AHN's Mem. of Law, Ex. A (doc. no. 89-2), at 3, Ex. B (doc. no. 89-3), at 3.  Under California law, "contract interpretation is a legal question for the court."  Legendary Investors Grp. No. 1, LLC v. Niemann, 169 Cal. Rptr. 3d 787, 793 (Cal. Ct. App. 2014) (citing Morrow v. L.A. Unified Sch. Dist., 57 Cal. Rptr. 3d 885, 901 (Cal. Ct. App. 2007)).

> The basic goal of contract interpretation is to give
> effect to the parties' mutual intent at the time of
> contracting.  When a contract is reduced to writing,
> the parties' intention is determined from the writing
> alone, if possible.  The words of a contract are to be
> understood in their ordinary and popular sense.
> [California] Civil Code section 1638 states [that] the
> language of a contract is to govern its interpretation,
> if the language is clear and explicit, and does not
> involve an absurdity.

Lueras v. BAC Home Loans Servicing, LP, 163 Cal. Rptr. 3d 804, 822-23 (Cal. Ct. App. 2013) (citations, internal quotation marks, and brackets omitted).

One fundamental problem with AHN's argument is its conflation of two different kinds of contractual provisions, i.e., liquidated-damages provisions and those that limit the liability of the defendant or the remedies available to a

successful plaintiff.  While AHN devotes considerable attention
to liquidated damages, the real issue here is whether the
agreement between AHN and Antech limits AHN's liability or the
remedies available to Antech.  It does not.

In its memorandum of law, AHN cites H.S. Perlin Co. v.
Morse Signal Devices of San Diego, 209 Cal. App. 3d 1289 (Cal.
Ct. App. 1989), as a case in which a plaintiff's recovery was
limited by a liquidated-damages provision.  In H.S. Perlin, the
court of appeals affirmed the trial court's enforcement of a
contractual provision that resulted in an award of $250 in
liquidated damages to a shop owner on a negligence claim against
its burglar-alarm service, after a burglary resulted in losses
of $959,000.  See id. at 1291-92.  The opinion in H.S. Perlin
quotes extensively from the agreement between the shop owner and
the alarm service, and based upon the language of the agreement,
it is clear that the court's decision was not based upon the
agreement's reference to liquidated damages but, rather, its
express limitation of the alarm service's liability to
liquidated damages.  See id. at 1292; see also Guthrie v. Am.
Prot. Indus., 206 Cal. Rptr. 834, 835 (Cal. Ct. App. 1984)
(enforcing similar contractual provision); Better Food Mkts. v.
Am. Dist. Tel. Co., 253 P.2d 10 (Cal. 1953) (same).  Here,
however, there is no language anywhere in either the Loan
Agreement or the Equipment Agreement that is remotely similar to

the language in the agreements in H.S. Perlin, Guthrie, and
Better Food Markets.  That is, neither of them says anything
about limiting AHN's liability for a breach, and neither
purports to limit the remedies available to Antech.  Thus, there
is nothing in either service agreement, or in both of them read
together, that would preclude Antech from being awarded damages
in addition to repayment of the loan it made AHN, recovery of
the equipment it provided AHN, and payment of any outstanding
invoices.

The court's interpretation, in turn, is consistent with the
language of the contract as a whole.  See Cal. Civ. Code § 1641
("The whole of a contract is to be taken together, so as to give
effect to every part, if reasonably practicable, each clause
helping to interpret the other.").  For example, with respect to
the remedy of declaring the loan Antech made to AHN due and
payable in the event of a default, Section 3.3 of the Loan
Agreement makes that remedy permissive.  See AHN's Mem. of Law,
Ex. A (doc. no. 89-2), at 3.  Moreover, that same section
explains that the remedies available under it "are intended to
compensate Antech for the Loan and discounts provided
hereunder."  Id.  What is missing from section 3.3, however, is
any indication that the remedies available thereunder were
intended to compensate Antech for other losses, such as lost

profits on sales it did not make to AHN over the last three years of the term of the agreement.

In sum, there is nothing in the contractual descriptions of the remedies that AHN calls liquidated damages that would preclude an award of the full range of damages Antech seeks from AHN in this case.

### b. Laboratory-Fee Discount

In addition to relying upon its liquidated-damages argument, AHN advances a second basis for a ruling that Antech is not entitled to recover the value of the pricing consideration described in Annex 1 to each of the two agreements. Specifically, AHN argues that: (1) nothing in either agreement indicates that the pricing consideration was intended as an incentive for AHN to enter into its Agreements with Antech; (2) even if pricing consideration was intended as an incentive, Section 3.3 of the Loan Agreement provides that calling the loan was the single remedy intended by the parties as compensation for the loan and associated discounts, in the event of a breach by AHN; and (3) Antech cannot recover the laboratory-fee discount because such a recovery, combined with lost profits going forward from the alleged breach, would put Antech in a better position than it would have occupied if AHN had performed its obligations under the contract.  The court agrees with AHN's third argument.

In support of its argument that it is entitled to recover the laboratory-fee discounts it gave AHN, Antech says that "AHN has cited no law – and Antech is aware of none – that would allow AHN to keep the consideration it received from Antech while failing to render the consideration it agreed to provide in exchange." Antech & Sound's Mem. of Law (doc. no. 95-1) 15. But, if Antech recovers the profits it lost as a result of AHN's breach, that will fully compensate Antech for the consideration AHN failed to provide. Allowing Antech to recover both its lost profits and the laboratory-fee discount would overcompensate Antech, allowing it to recover the full consideration that AHN promised it, plus part of the consideration it gave AHN in exchange for AHN's promise to use Antech's laboratory services for six years. In other words, it would not be fair to make AHN give up the discount without also relieving it of the obligation it assumed in exchange for the discount, i.e., its agreement to use Antech's services, exclusively, for six years. Without that agreement, however, Antech would have no basis for a breach-of-contract claim against AHN. To sum up, Antech has cited no law, and the court is aware of none, that would allow it to both: (1) recover the consideration it gave AHN; and (2) recover for AHN's breach of the promise it gave in exchange for that consideration.

c. Value of the Equipment

The court has rejected the only argument advanced by AHN that would preclude Antech from recovering the cash value of the equipment it provided to AHN.  Even so, the court offers the following observation for the guidance of the parties as this case moves forward.  If this case goes to trial, and the jury finds that AHN is liable to Antech for breach of contract, then the jury may need to determine the value of the Sound equipment.[2] When it does so, it will have before it a variety of evidence, including: (1) the list price of that equipment; (2) the lesser amount that Antech actually paid Sound for the equipment;[3] and (3) the "depreciation" schedule in the Equipment Agreement, which gave AHN, under certain circumstances, the right to purchase the equipment for a percentage of its "original" price that diminished over time.  The point is that the jury is likely to have before it a substantial amount of evidence from which it could reasonably determine that, at the time of breach, the equipment in AHN's possession was worth considerably less than

_____

[2] As noted, the court has already ruled that nothing in the two service agreements requires Antech to take back the equipment rather than being compensated for it, in cash, and the court is aware of no legal basis that would allow a breaching party to choose the remedy available to the party who was the victim of the breach.

[3] Annex 2 to the Equipment Agreement includes documentation suggesting that Sound gave Antech two separate discounts, thus lowering the cost of the equipment from $138,770 to $95,000.  See AHN's Mem. of Law, Ex. B. (doc. no. 89-3), at S00001.

the $139,000 Antech claims in damages resulting from AHN's possession of the equipment.

### 4. Summary

AHN's motion for summary judgment on the limitation of damages, document no. 89, is granted in part, but only to the extent that Antech is barred from recovering both the pricing consideration it gave AHN on the services it purchased before it stopped doing business with Antech and the profits it lost afterward.  Otherwise, the motion is denied.

### C. Document No. 96

In document no. 96, Antech asks the court to strike three exhibits attached to document no. 89, the summary-judgment motion the court disposed of in the previous section.  Antech argues that because the three exhibits are inadmissible, they should be stricken from the summary-judgment record, but offers no legal authority for the relief it seeks.  Because the court did not rely upon the disputed evidence in ruling on document no. 89, Antech's motion to strike, document no. 96, is denied as moot.

### D. Document No. 118

In document no. 118, AHN takes another shot at limiting the kinds of damages to which Antech might be entitled if it prevails on its counterclaims.  Specifically, it asks the court

to rule that Antech is not entitled to recover lost profits.
Antech objects.  Again, Antech's objection is well taken.

AHN's basic argument is this: (1) Antech's lost profits
equal the amount AHN would have paid for services from Antech,
less the costs Antech would have incurred to provide those
services; (2) Antech's costs are made up of both variable costs
and fixed costs; and (3) Antech's expert opinion on lost profits
takes into account only fixed costs.  As a result, AHN argues,
Antech's expert opinion is invalid as a matter of law, which
entitles it to an order precluding Antech from recovering lost
profits.  Antech raises a number of objections.  To make a long
story short, nothing in AHN's briefing and nothing said at oral
argument has persuaded the court that, as a matter of law, the
jury would be incapable of determining Antech's lost profits.
Accordingly, AHN's motion for summary judgment on this issue,
document no. 118, is denied.

    E. Document No. 98

    In document no. 98, Antech and Sound seek judgment as a
matter of law on AHN's claims against them to the extent those
claims are based upon any alleged deficiencies in the equipment
that Antech provided to AHN.  AHN objects.  For the reasons that
follow, the court agrees with Antech and Sound.

### 1. Background

The Equipment Agreement provides, in pertinent part, that "[a]s an incentive to enter into this Agreement, Antech will provide to Animal Hospital Owner the Sound Technologies equipment described [in] Annex 2 attached hereto, and subject to the terms and conditions set forth in Section 3."  Antech & Sound's Mem. of Law, Ex. B (doc. no. 98-3), at A033947 (emphasis in the original).  Section 3, in turn, provides as follows:

> **Sound Technologies Equipment**.  As additional consideration for Animal Hospital's agreement to use an Antech lab as its primary laboratory services provider, Antech shall provide to Animal Hospital for its use the Sound Technologies equipment identified in Annex 2 attached hereto (the "**STI Equipment**"); provided, however, that during the Term, Antech shall purchase from Sound Technologies, Inc., Silver Sound Assurance coverage under standard terms and conditions applicable to maintenance and warranty coverage for such STI Equipment.  Antech shall retain title to the STI Equipment at all times during the Term.

Id. at A033948 (emphasis in the original).  The requirement that Antech purchase warranty coverage is a handwritten amendment to the printed Equipment Agreement, which originally required AHN to purchase the warranty.[4]  That amendment, in turn, was negotiated by AHN.  See Antech & Sound's Reply, Ex. A, Bishop

_____

[4] Antech's obligation to pay for the warranty is also reflected in Sound's Order Summary, which includes as a "special instruction," the following notation: "ANTECH is responsible for financial obligation of equipment costs and Silver Sound Assurance coverage for months 13-60."  Antech & Sound's Mem. of Law, Ex. B (doc. no. 98-3), at A033960.

Dep. (doc. no. 113-1) 84:9-13, 122:7-123:15, June 27, 2013.[5]
While section 3 of the Equipment Agreement was amended to shift
the responsibility for paying for the warranty to Antech, it was
not amended to require the warranty Antech purchased to exceed
"standard terms and conditions."

Annex 2 to the Equipment Agreement provides, in pertinent
part:

> The laboratory services agreement will include [a] DR
> system installed in each [of] your hospitals in
> exchange for your commitment to utilize [the] ANTECH
> Diagnostics Reference Library. . . . You would own
> the systems free and clear after 5 years.

Antech & Sound's Mem. of Law , Ex. B (doc. no. 98-3), at A033951.
Without going into undue technical detail, the STI Equipment
provided by Antech consisted of: (1) an x-ray machine (with a
list price of $79,000); (2) an associated workstation (with a
list price of $8,070); (3) two additional free-standing
workstations (each with a list price of $4,500; and (4) a server
(with a list price of $19,850).  The specifications for the
workstations indicated that each of them came loaded with the
Windows XP operating system and a license to run certain STI

---

[5] In support of the proposition that "AHN did not negotiate
the terms of . . . either of the Services Agreements," AHN's Mem.
of Law (doc. no. 103-1) 5, AHN cites deposition testimony from
AHN employee Donna Cole in which she agreed that she was "the
lead negotiator" for AHN in its dealings with Antech, id., Ex. C,
Cole Dep. (doc. no. 103-7) 88:2, Mar. 28, 2013, and that, with
regard to various terms in the service agreements, "Antech was
offering and we were counter-offering," id. at 89:8-10.

software known as VetPACS.  More specifically, the order summary
from Sound indicates that it provided AHN with: (1) a "VetPACS
DICOM Digital Enterprise License," id. at A033954, (with a list
price of $10,000); and (2) a "VetPACS OrthoPlan Software
License," id., (with a list price of $5,000).

The warranty mentioned in Section 3 of the Equipment
Agreement was memorialized in a Warranty Agreement.  See Antech &
Sound's Mem. of Law, Ex. B. (doc. no. 98-3), at S00005-S00011.
The warranty had an initial term of one year, which was included
with the purchase of the equipment.  See id. at S00005.  The
Warranty Agreement also provided for the purchase of two-year
renewal terms, at a cost of $2,500 per year.  See id.  Antech
purchased a two-year renewal term at the same time it purchased
the equipment.  See id.

With regard to the scope of its coverage, Section 11 of the
Warranty Agreement provides, in pertinent part:

> STI warrants that the Covered Products and each Work
> Station will (1) be free from defects in material,
> workmanship, and title, and (2) conform to our
> published product specifications in effect on the date
> of order of the products[.]  . . .  STI may, in its
> sole discretion, repair and/or replace such stations
> during the warranty period.  . . .  This warranty is
> renewable . . .; provided, however, that with respect
> to each Work Station, the maximum term of the warranty
> is ONE (1) YEAR, and such warranty is not and may not
> be included in any Renewal Term.

Antech & Sound's Mem. of Law, Ex. B (doc. no. 98-3), at S00008.
While Section 11 excludes workstations from any renewal term,

the executive summary of the Warranty Agreement provides an

exception to the exclusion, and allows for renewal of the

warranty on the workstation associated with the x-ray machine.

See id. at S00005.

Section 8 of the Warranty Agreement, in turn, describes

several elements of the STI Equipment that were not warranted:

> No guarantee or commitment as to the type of products,
> functionality, enhancements, additions, usability or
> uptime with respect to the Software is implied or
> expressed by STI.
>
> > a.   So long as Customer remains in good standing
> > under the Sound Assurance program . . .
> > patches, fixes and minor enhancements to
> > VetPACS software will be provided to
> > Customer free of charge.
> >
> > . . . .
> >
> > c.   Nothing in this Agreement shall obligate STI
> > to develop, create, test, release, support
> > or provide for use, or sell any new
> > software, software patches, or software
> > functionality ("Software Enhancements").
> > Customer has no implied nor specific right,
> > to receive or demand any Software
> > Enhancements.

Antech & Sound's Mem. of Law, Ex. B (doc. no. 98-3), at S00007.

The Warranty Agreement also includes the following provision

regarding limitation of liability:

> IN NO EVENT, WHETHER AS A RESULT OF BREACH OF
> CONTRACT, WARRANTY, TORT, STRICT LIABILITY, STATUTE OR
> OTHERWISE, SHALL EITHER PARTY BE LIABLE TO THE OTHER
> FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR
> CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES RELATED
> TO THIS AGREEMENT (INCLUDING, BUT NOT LIMITED TO,
> DAMAGES FOR LOST BUSINESS PROFITS, LOSS OF DATA,
> INTERRUPTION IN USE OF EQUIPMENT OR UNAVAILABILITY OF

DATA), INCLUDING CLAIMS OF ANY THIRD PARTY.  STI'S
ENTIRE LIABILITY AND CUSTOMER'S EXCLUSIVE REMEDY SHALL
BE FOR STI TO REPERFORM SERVICES WITHIN A REASONABLE
TIME FRAME; PROVIDED, THAT IN THE EVENT STI IS UNABLE
TO CORRECT ANY BREACH OR DEFAULT OF THIS AGREEMENT,
STI MAY ELECT TO REFUND TO CUSTOMER AN AMOUNT EQUAL TO
THE ANNUAL FEE FOR A RENEWAL TERM (REGARDLESS OF
WHETHER SUCH BREACH OR DEFAULT OCCURS DURING THE
INTIAL TERM OR DURING A RENEWAL TERM) IN FULL
SATISFACTION OF STI'S OBLIGATIONS UNDER THIS
AGREEMENT.  SUCH REPERFORMANCE OR REFUND SHALL
CONSTITUTE STI'S ENTIRE LIABILITY AND CUSTOMER'S
EXCLUSIVE REMEDY WITH RESPECT FOR SUCH DEFAULT OR
BREACH.

Id. at S00008-09.

    AHN received and began using the STI Equipment in the late

summer of 2008.  It used the equipment, without incident, until

February of 2011.  At that point, AHN's information technology

consultant began upgrading AHN's computer system to run the

Windows 7 operating system.  Among other things, the consultant

attempted to run VetPACS on a computer on which Windows 7 had

been installed, but was unable to do so.  Then, Sound confirmed

that: (1) VetPACS ran on Windows XP, the operating system that

Sound installed on the three workstations that Antech provided to

AHN, but did not run on Windows 7; and (2) it had replaced

VetPACS with a new product, called "eSeries," and stopped

developing VetPACS.

    2. Discussion

    All three of AHN's claims against Antech and all three of

its claims against Sound are based, in part, on some version of

an allegation that the defendant "provid[ed] an X-Ray System

21

that became obsolete," Am. Compl. (doc. no. 17) ¶ 103, and was

"non-responsive[] in dealing with . . . the obsolete X-Ray

System," id.  AHN defends against Antech's three counterclaims

on similar grounds.  The obsolescence to which AHN refers is the

incompatibility of Sound's VetPACS software with the Windows 7

operating system to which AHN upgraded.  Here is the crux of

AHN's position:

> At the time AHN entered into the Equipment Service
> Agreement, it used workstations that ran on versions of
> Microsoft Windows older than Windows 7.  Given the
> history of Microsoft's releases of Windows software,
> there was no question that new versions of Microsoft
> Windows would be released during the six-year term of
> the Agreement.  Therefore, it was reasonable for AHN,
> Antech, and [Sound] to expect that Vet-PACS should
> function with future versions of Windows, including
> Windows 7 and any other versions of Windows that AHN
> would install in its workstations.

Antech & Sound's Mem. of Law (doc. no. 98-1) 7 (quoting AHN's

Supp. Answers to Antech's First Set of Interrogs. (Answer No. 24)

19 (emphasis added by Antech & Sound).  In other words, AHN

appears to argue that for the STI Equipment to have been free

from defects, it was necessary for VetPACS to have anticipated

and accommodated the next six years' worth of Microsoft's

development of the Windows operating system.  To borrow a phrase

from Judge Siggins of the California Court of Appeals, "[t]o

state [AHN's] premise is to refute [its] logic."  Samaniego v.

Empire Today LLC, 140 Cal. Rptr. 3d 492, 500 (Cal. Ct. App.

2012).

Defendants argue that all of AHN's claims and defenses based upon the alleged obsolescence of the STI Equipment fail as a matter of law because: (1) Antech's only obligation under the Equipment Agreement was to purchase the equipment described therein from Sound and deliver it to AHN, which it did; (2) in the Warranty Agreement, Sound expressly disclaimed any obligation to undertake any additional development of VetPACS; (3) the Warranty Agreement precludes AHN from recovering damages; and (4) AHN breached the Warranty Agreement by trying to combine VetPACS and Windows 7.  AHN contends that: (1) Antech had an obligation to deliver equipment that would function for the six-year term of the Equipment Agreement; (2) the Warranty Agreement is unenforceable because it is both procedurally and substantively unconscionable and because it fails of its essential purpose; (3) even if the Warranty Agreement is enforceable, it does not preclude the claims asserted against Sound in this case; (4) it, i.e., AHN, did not breach the Warranty Agreement; and (5) resolution of the issues raised in defendants' motion requires expert testimony to assist the trier of fact in understanding various terms used in the Warranty Agreement.  In the discussion that follows, the court considers each defendant separately.

a. Antech

Antech's obligations to AHN were spelled out in the Loan Agreement and the Equipment Agreement.  In the Equipment Agreement, Antech promised to provide AHN with certain pieces of hardware and software.  It is undisputed that Antech provided exactly the hardware and software specified in the Equipment Agreement.  In an attempt to establish that Antech provided the equipment it promised to provide yet breached its agreement with AHN, AHN invokes the implied warranty of merchantability.  AHN's reliance upon that warranty is unavailing.

Presuming, for the sake of argument, that it is even proper to consider an argument based upon a legal theory inserted into the case at this late date, the implied warranty of merchantability is inapplicable to the facts of this case because: (1) Antech was not a merchant; (2) it did not sell any goods to AHN; and (3) at the time of sale, the goods were merchantable.

In an order on which AHN relies, Judge Fogel explained that "[t]here exists in every contract for the sale of goods by a merchant a warranty that the goods shall be merchantable." Kent v. Hewlett-Packard Co., No. 09-5341 JF (PVT), 2010 WL 2681767, at *4 (N.D. Cal. July 6, 2010) (quoting Atkinson v. Elk Corp. of Tex., 48 Cal. Rptr. 3d 247, 257 (Cal. Ct. App. 2006)).  The "merchant" to which Judge Fogel refers is "a merchant with

respect to goods of that kind," Cal. Com. Code § 2314(1).  Under
California's enactment of the Uniform Commercial Code ("UCC"),
Antech does not appear to be a merchant of x-ray equipment.  See
Cal. Com. Code § 2104(1).  Beyond that, the Equipment Agreement
was not a "contract for the sale of goods," given that "[a]
'sale' consists in the passing of title from the seller to the
buyer for a price," Cal. Com. Code § 2106(1), and the Equipment
Agreement provided that "Antech [would] retain title to the STI
Equipment at all times during the Term [of the agreement],"
Antech & Sound's Mem. of Law, Ex. B (doc. no. 98-3), at A033948.

Moreover, merchantability is measured at the time of
delivery.  See Mexia v. Rinker Boat Co., 95 Cal. Rptr. 3d 285,
290 (Cal. Ct. App. 2009).  Here, it is undisputed that the STI
Equipment, including VetPACS, functioned as AHN believed it was
supposed to function for the first two and one half years that
AHN used it.  See Bishop Dep. 214:14-18.  Necessarily, then, the
STI Equipment, including VetPACS, was merchantable at the time of
its delivery.  To be sure, the California legislature also
enacted the Song-Beverly Act, which includes provisions more
favorable to consumers than those of the California version of
the UCC, see Mexia, 95 Cal. Rptr. 3d at 290, but even under the
pro-consumer Song-Beverly Act, the implied warranty of
merchantability has a duration of "no[] more than one year
following the sale of new consumer goods," Cal. Com. Code. §

1791.1(c).  And, again, by AHN's own admission, VetPACS worked just fine for more than two years after AHN took delivery of the STI Equipment.

Turning from the law to the facts of this case, the court offers the following observations.  AHN argues that the implied warranty of merchantability required Antech to provide it with equipment that included software that would be compatible with the next six years' worth of Windows operating systems.  But, AHN also says that it, Antech, and Sound all knew that Windows XP was very likely to be replaced during the term of the Equipment Agreement.  See Antech & Sound's Mem. of Law (doc. no. 98-1) 7. Thus, while AHN concedes that it recognized the threat of obsolescence, and had an "astute negotiator" working on the Equipment Agreement, see Bishop Dep. 84:10, it agreed to accept workstations that ran Windows XP and agreed to accept "warranty coverage under standard terms and conditions," Antech & Sound's Mem. of Law, Ex. B (doc. no. 98-3), at A033948.  Given AHN's admitted knowledge of the potentially limited shelf-life of Windows XP, and its admitted and demonstrated ability to negotiate the terms of the Equipment Agreement, it hardly seems right to hold Antech liable for the consequences of a situation that AHN itself anticipated and against which it could have attempted to protect itself.

To conclude, because the California version of the UCC does not apply to Antech's provision of equipment to AHN, and because VetPACS was merchantable for more than two years after AHN acquired it, AHN's reliance upon the implied warranty of merchantability does it no good.  Accordingly, as to any claim or defense asserted by AHN that relies upon the implied warranty of merchantability, Antech is entitled to judgment as a matter of law.

### b. Sound

In Count VIII of its amended complaint, AHN claims that Sound breached the Warranty Agreement by "providing an X-Ray System that became obsolete and [by] its non-responsiveness in dealing with the obsolete X-Ray System."[6]  Am. Compl. ¶ 142. While AHN identifies the conduct on which its claim is based, it does not identify the specific contractual obligation that Sound supposedly failed to fulfill, nor does it explain how Sound's conduct constituted a breach of the Warranty Agreement.  Closer scrutiny is required.

---

[6] Sound does not defend against AHN's breach-of-contract claim on grounds that AHN was not a party to the Warranty Agreement, and the court assumes that AHN has standing, as a third-party beneficiary, to sue Sound for breaching it.  See B Spinks v. Equity Resid. Briarwood Apts., 90 Cal. Rptr. 3d 453, 468 (Cal. Ct. App. 2009) ("California law permits third party beneficiaries to enforce the terms of a contract made for their benefit.") (quoting Principal Mut. Life Ins. Co. v. Vars, Pave, McCord & Freedman, 77 Cal. Rptr. 2d 479, 489 (Cal. Ct. App. 1998)); see also Cal. Civ. Code § 1559 ("A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it.").

In the Equipment Agreement, Sound obligated itself to provide covered products and workstations that were "free from defects in material, workmanship, and title," and that "conform[ed] to [its] published product specifications."  Antech & Sound's Mem. of Law, Ex. B (doc. no. 98-3), at S00008.  Here, AHN says nothing about defects in title or a failure to conform to specifications, so its claim must be that some product or workstation it received from Sound had either a defect in materials or a defect in workmanship.

AHN alleges a defect in the VetPACS software that was installed on the workstation associated with the x-ray machine, which is the only workstation that was still under warranty in February of 2011.  That defect is the inability of VetPACS to run on Windows 7.  The problem is that such a defect does not appear to be a defect in either materials or workmanship.  Rather, as Judge Wigenton points out,

> [a] defect in the programming of . . . software is not akin to a defect in materials or substandard workmanship . . . .  See Brothers v. Hewlett Packard Co., [No. C-06-02254 RMW,] 2007 WL 485979, at *4 (N. D. Cal. Feb. 12, 2007) ("Unlike defects in materials or workmanship, a design defect is manufactured in accordance with the product's intended specifica- tions.") (applying California law) (Emphasis added); see also Cooper [v. Samsung Elecs. Am., Inc.], 374 F. App'x [250, 253 (3d Cir. 2010)] (concluding that breach of express warranty claim failed because plaintiff's allegation that "the design deviated from Samsung's advertisements and packaging" was not a "manufacturing defect" that would be covered by this warranty).

Hughes v. Panasonic Consumer Elecs. Co., Civ. Acton No. 10-846 (SDW), 2011 WL 2976839, at *19 (D.N.J. July 21, 2011).

If indeed the defect on which AHN bases its claim is a design defect rather than a manufacturing defect, then Sound would be entitled to judgment as a matter of law that it did not breach the Warranty Agreement by providing AHN with equipment and/or a workstation that included software that was not compatible with Windows 7.  In the face of this issue, the court could simply assume, as defendants appear to, that Count VIII is based upon a defect in materials or workmanship and then wade into the complicated warranty-based defenses on which Sound relies.  Or, the court could request further briefing, pursuant to Rule 56(f)(2) of the Federal Rules of Civil Procedure, on the question of whether, in the first instance, the defects alleged by AHN could possibly support a claim for breach of the warranty against defects in materials and workmanship expressed in Section 11 of the Warranty Agreement.  In the interest of judicial economy, i.e., the avoidance of issues requiring the application of unfamiliar law and issues that that may not need to be decided, the court choses the second course of action.

Accordingly, AHN is ordered to show cause why Sound should not be granted Summary Judgment on Counts VIII and IX of AHN's amended complaint.  Similarly, given the undisputed fact that Antech rather than AHN bore the cost of the warranty, and AHN's

allegation in its amended complaint that it paid for the warranty coverage, AHN is directed to show cause why Sound should not be granted summary judgment on the claim for unjust enrichment stated in Count XIII.

## Conclusion

For the reasons described above: (1) AHN's first motion for partial summary judgment on the issue of damages, document no. 89 is granted, but only to the extent that Antech is barred from recovering both the pricing consideration it gave AHN on the services it purchased before it stopped doing business with Antech and the profits it lost afterward; (2) Antech's motion to strike, document no. 96, is denied as moot; (3) AHN's second motion for partial summary judgment on the issue of damages, document no. 118, is denied; and (4) defendants' motion for partial summary judgment, document no. 98, is granted as to Antech, while the court's decision as to Sound is deferred, pending receipt of the show-cause briefing the court has requested.  With regard to timing, AHN has ten days from the date of this order to respond, and Sound has ten days to respond to AHN's briefing.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

May 15, 2014

30

```
cc:   Phillip A. Baker, Esq.
      Julie B. Brennan, Esq.
      Adam J. Chandler, Esq.
      Robert M. Fojo, Esq.
      Brian H. Lamkin, Esq.
      Christopher T. Vrountas, Esq.
```